UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 22-20498-CR-GAYLES/GOODMAN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

DANIEL ARTURO CAMARGO,

     Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON
## <u>DEFENDANT'S MOTION TO DISMISS</u>

On February 22, 2022, a federal prosecutor advised a Federal Bureau of Investigation ("FBI") Special Agent that an investigation and possible prosecution concerning the alleged March 4, 2021 assault of a minor child on an aircraft was "not a priority." That comment, as we will soon learn, turned out to be both a correct summary of what had happened (or not happened) in the previous year *and* an accurate prediction of how the Government would proceed (or not proceed) to handle the case going forward. The United States did not file its misdemeanor Information (alleging one count of assault within special aircraft jurisdiction, in violation of 18 U.S.C. § 113(a)(5) until October 20, 2022, and it did not arrest Defendant Daniel Arturo Camargo ("Defendant"

or "Camargo") until February 1, 2004. So it took the United States more than one year and three months after the charge was filed to arrest him and more than 19 months after the alleged incident to file the charge.

Camargo filed [ECF No. 22] a Motion to Dismiss Information, contending that the United States violated his constitutional right to a speedy trial under the Sixth Amendment and his procedural rights under Federal Rule of Criminal Procedure 48. The United States filed [ECF No. 31] a response and Camargo filed an optional reply [ECF No. 35]. United States District Judge Darrin P. Gayles referred [ECF No. 23] the motion to the Undersigned. Ultimately, neither side requested an evidentiary hearing,[1] and the Undersigned held a one hour and 40-minute hearing [ECF No. 41].

The underlying factual scenario, which will be outlined below, establishes that the United States was not always adequately focused in pursuing its investigation and in effectuating Camargo's arrest. In fact, the record demonstrates that the United States was at times negligent in accomplishing these tasks.

Nevertheless, recent Eleventh Circuit law, which the Undersigned is required to follow over some earlier non-binding district court cases (that arguably could have

---

[1]     In fact, in response to a Court Order seeking clarification of his initial evidentiary hearing request, Camargo expressly noted that he was *no longer* seeking an evidentiary hearing because the additional reports he received converted the motion into one where "the only remaining issues are *legal* ones." [ECF No. 36 (emphasis supplied)].

generated support for a dismissal),[2] militates against an Order granting the dismissal motion. At bottom, the United States did not act in bad faith or intentionally delay the case. Because the negligence, some of which was aggravated by the failure of the victim and her mother to advise the United States that they had moved and the existence of the COVID-19 pandemic, is not the kind of "flagrant and inexcusable conduct" which would weigh *heavily* against the Government, Camargo cannot prevail.

Camargo cannot show that the relevant factors uniformly weigh **heavily** against the Government, which means that he must demonstrate that he was actually prejudiced by the delay. But Camargo has not *established* any actual prejudice (even though his motion argues, in a wholly conclusory way, that he was). Thus, Camargo's right to a speedy trial was not impaired by the total delay (caused, in large part, by government inattentiveness and negligence). That result forecloses his argument that Fed. R. Crim. P.. 48 also requires a dismissal.

## I.    Factual Background

The one charge filed in this case arises from an alleged incident occurring shortly after midnight on a redeye flight from Las Vegas, Nevada to Miami, Florida on March 4, 2021.

---

[2]      *See, e.g., United States v. Bell*, 546 F.Supp.3d 1136 (S.D. Fla. 2021) (granting motion to dismiss in unauthorized access device case involving a four-year delay between indictment and arrest – but noting that a missing witness, which *is* a factor in the instant case, is a valid excuse which justifies reasonable delay).

**The United States provides the following allegations as the underlying factual scenario:**[3]

The twelve-year-old Minor Victim was sitting in a middle seat toward the back of the plane in row 35. She was traveling with her mother, who was sitting in the window seat. They were headed to Miami for a vacation during the Minor Victim's spring break. Camargo was sitting in the aisle seat directly next to the Minor Victim. The Minor Victim's mother fell asleep shortly after getting settled on the airplane. The Minor Victim stayed up and tried to find something to watch on the screen in front of her. The lights in the cabin of the airplane were dimmed, and it was dark.

When her mother was asleep next to her, the Minor Victim felt Defendant put his hand on her thigh. The Minor Victim was stunned and took a moment to process what was occurring. Though she was screaming on the inside, she could not get herself to speak. Defendant then began to rub the Minor Victim's leg and thigh area, moving his hand up and down. In an effort to get him to stop, the Minor Victim grabbed her coat that was in front of her and put it on her lap.

Camargo stopped for a moment, but then continued to rub the Minor Victim's leg and thigh area. As the flight attendants were getting the beverage carts ready, the Minor Victim's mother woke up and saw Defendant's hand on her daughter's thigh. The Minor Victim's mother began screaming, asked Defendant what he was doing, and told him to

---

[3]     *See* [ECF No. 31, pp. 1–2].

4

take his hands off her daughter. The Minor Victim's mother frantically pressed the call button for a flight attendant to come help.

When Flight Attendant 1 arrived at row 35, the Minor Victim's mother said that Defendant had been touching her daughter and asked that he be moved. Defendant was moved to another seat closer to the middle of the plane. The Minor Victim was traumatized, shaken, and crying, while her mother sat in disbelief.

When the plane landed in Miami, officers met them at the gate. Law enforcement interviewed the Minor Victim and her mother. The Minor Victim did not say much, but her mother conveyed what happened to the officers. Officers also interviewed Camargo and he denied that anything occurred. He was not arrested that day.

Shortly after the incident, in March 2021, a federal investigation was opened in the Southern District of Florida. As part of the investigation, several witnesses who were on the plane were interviewed. The FBI memorialized each interview conducted in a report. On March 19, 2021, the FBI separately interviewed Flight Attendant 1 and Flight Attendant 2. Flight Attendant 1 said that he responded to row 35 when the Minor Victim's mother hit the call button. The Minor Victim's mother told him that the male passenger next to the Minor Victim had touched her daughter and that she wanted him moved. Flight Attendant 1 told Defendant that he needed to move him, and Defendant replied, "please do." Defendant was moved to seat 24C near some of the flight attendants' seats, where no other passengers were seated.

On April 15, 2021, the Minor Victim was interviewed at a Child Advocacy Center in a video- and audio-recorded forensic interview. During the interview, the Minor Victim provided details about what happened to her on the airplane on March 4, 2021. Additionally, the Minor Victim told the interviewer that she wanted to correct something she had told the officers when she disembarked the plane. The Minor Victim went on to say that she believed she told the officers that she told Defendant to stop, but, after thinking about it, does not believe she said anything out loud, even though she wanted to. She also explained that when the plane landed, she was tired and did not feel like speaking to anyone.

On April 16, 2021, Flight Attendant 3 was interviewed. She said that, prior to the beverage service, she was setting up the carts and saw that the call button in row 35 had been activated. She said that Flight Attendant 1 approached row 35, and that she saw the Minor Victim's mother in the section flailing her hands and acting hysterical. Flight Attendant 3 learned that the Minor Victim's mother told Flight Attendant 1 that the male passenger in the aisle seat had touched her daughter.

Afterwards, Flight Attendant 2 told Flight Attendant 3 to stay with the Minor Victim and her mother for the remainder of the flight to make sure they did not have any other interactions with Defendant. Flight Attendant 3 told officers that the Minor Victim and her mother did not say much the rest of the plane ride and seemed to be in disbelief.

A male passenger and a female passenger sitting in row 34 in front of the Minor Victim were interviewed shortly after the incident. On April 20, 2021, the female passenger in row 34 ("Witness 1") told law enforcement that she was with her boyfriend on the flight and was woken up by a commotion behind her. Witness 1 said that the female adult passenger behind her was upset and told a flight attendant that the male in row 35 had touched her daughter. The male passenger was moved, and she did not hear him say anything.

On May 10, 2021, the male passenger in row 34 ("Witness 2") told law enforcement that shortly into the flight he heard a commotion behind him, and described a mother who was furiously yelling at a male in the aisle seat of row 35. Witness 2 stated that the mother said something like "don't you ever touch my fucking daughter" and "get the fuck back." The male passenger from row 35 was moved closer to the middle of the plane, and Witness 2 overheard him claiming that he had not touched her. Afterwards, Witness 2 heard the mother and daughter talking, and the mother asked her daughter where the man touched her. The daughter indicated he had touched her on the leg.

At the end of May 2021, the case agent provided some of the reports and evidence to the U.S. Attorney's Office. In the months that followed, the case was assessed by the U.S. Attorney's Office to determine whether to bring federal charges. The case involved multiple considerations beyond just reviewing the charges and was being evaluated by the Assistant United States Attorney ("AUSA"), who was simultaneously handling

several other assigned investigations. In addition to considering what charges to file and the sufficiency of the evidence, of special concern was considering how to best proceed with a twelve-year-old Minor Victim whose testimony would be needed at trial, and how the prosecution might affect the Minor Victim (who would likely experience significant anxiety in having to relive a traumatic event by speaking to prosecutors and potentially testifying in court).

Also factored into the investigation and charging decision was the fact that the Minor Victim and her mother live outside the jurisdiction, and would need to travel for any court proceedings, which would disrupt the Minor Victim's daily schedule and schooling. Moreover, the COVID-19 pandemic was continuing to cause delays in court cases and air travel. Like the Minor Victim and her mother, most of the witnesses lived outside of Florida.

At the beginning of 2022, FBI Special Agent Rene Luna ("SA Luna") "checked in" with the Minor Victim and her mother to see how the Minor Victim was doing and to assess whether to move forward with charges. The Minor Victim's mother said that the Minor Victim was continuing to grapple with the effects of the traumatic incident. SA Luna told the Minor Victim's mother to determine whether the Minor Victim wanted to move forward with charges, and whether she was ready to proceed. While awaiting their reply, SA Luna contacted the other witnesses to confirm whether they would be willing

and able to testify if the case were to proceed to trial. In April 2022, the Minor Victim and her mother indicated that they supported moving forward with charges.

On October 20, 2022, nineteen and a half months after the incident, Defendant was informed on federal charges. [ECF No. 3]. On December 1, 2022, a paperless order was issued transferring the case to fugitive status. [ECF No. 5]. Before arresting Defendant, SA Luna again attempted to "check in" with the Minor Victim and her mother because they had not spoken in some months. SA Luna wanted to again confirm they were ready to move forward with the court proceedings.

In December 2022 and January 2023, SA Luna attempted to speak with the Minor Victim's mother by using the number he had previously used to contact her, but he was not able to reach her. An Accurint search was run at the end of January 2023, providing two additional numbers for the Minor Victim's mother. SA Luna called those numbers, but they were not working. The FBI had not received any communication from the Minor Victim's mother for a few months, so, in the beginning of May 2023, SA Luna sent a letter to the Minor Victim's mother, asking her to contact the FBI regarding the case. Shortly thereafter, SA Luna heard from the Minor Victim's mother, who said she had obtained a new number and did want to proceed with the case. At that time, the AUSA handling the case was on paternity leave and the case was reassigned to another AUSA in the summer of 2023. In the fall of 2023, law enforcement "lined up" all the necessary witnesses, confirming their availability and contact information.

At the end of October 2023, SA Luna called Camargo and spoke to him. SA Luna identified himself and told Defendant he was calling about an incident that occurred in March 2021 on an airplane. Defendant stated he knew what SA Luna was referring to. SA Luna asked Defendant if they could meet that week to discuss the matter, but Defendant said that date did not work for him. Camargo further stated that he was leaving town on November 1, 2023, and would be gone for two weeks. Defendant told SA Luna that he could meet when he returned to Miami and SA Luna advised Defendant that he would follow up with him then.

On November 13, 2023, SA Luna texted Camargo, asking if he could come to the FBI's office in Miramar that Wednesday or Thursday, but he received no response. Around that time, the case was transferred from SA Luna to FBI Special Agent Neill Fagan ("SA Fagan"). At the end of November 2023, SA Fagan conducted a database check of the Driver and Vehicle Information Database ("DAVID") for Defendant that provided a current address and two vehicles registered in Defendant's name. On November 30, 2023, agents conducted surveillance at Defendant's residence and were able to observe one of Defendant's registered vehicles parked near the residence.

On December 6, 2023, SA Fagan conducted a NCIC check for Defendant, which revealed that Defendant had been arrested in July 2022 for sexual battery and "massage/practice without a license"; that case was no-actioned. SA Fagan requested the police report for that case from the Miami Beach Police Department, which it provided.

10

On January 16, 2024, the warrant was entered into the NCIC system. On January 17, 2024, surveillance was conducted at Defendant's residence and his vehicle was observed parked near the residence. Due to "operational logistics," including manpower and "competing interests," Defendant was not arrested in December 2023 or January 2024.

On February 1, 2024, Defendant was arrested and taken into federal custody pursuant to the outstanding arrest warrant and information. That same day, Defendant had his initial appearance and arraignment. [ECF No. 7]. He was released on a $25,000 personal surety bond. [ECF No. 12].

On February 2, 2024, the Court set the case for the two-week trial period beginning on March 11, 2024. [ECF No. 9].

On February 7, 2024, AFPD Marisa Taney emailed AUSA Eduardo Gardea, Jr. requesting discovery on the case prior to the discovery deadline. That same day, defense counsel received two reports drafted by SA Luna, which described the incident and included the names of two FBI task-force officers, one Miami-Dade Police Department officer, an American Airlines corporate security investigator, and two of the flight attendants.

On February 14, 2024, the currently-assigned AUSA emailed defense counsel a proposed motion and protective order for the discovery. Included in the discovery was the forensic interview video of the twelve-year-old Minor Victim, and the flight manifest, which contained the name of every passenger on the airplane.

The following day, defense counsel responded, noting the defense's objection to a particular clause in the Government's proposed protective order which would require that Defendant be prohibited from maintaining his own copy of the confidential discovery. In support of the objection, defense counsel represented that another AUSA had recently agreed to remove that clause in a different case.

On February 18, 2024, the Government provided defense counsel with 53 pages of discovery, which included reports of witness interviews, including the Minor Victim and her mother, and handwritten notes associated with some of those interviews. Also on February 18, 2024, defense counsel was advised that the forensic interview video and flight manifest were available for inspection while the parties continued to confer about the protective order.

On March 4, 2024, Defendant filed a motion to continue the trial, which was granted, and the trial was reset for May 6, 2024. [ECF Nos. 14–16]. The Government filed its first response to the standing discovery order on March 31, 2024, which explained that copies of certain documents had been provided to defense counsel, and that the remaining documents and forensic interview were made available for inspection on February 18, 2024. [ECF No. 17]. After the parties reached an impasse on discussions about the protective order, on April 1, 2024, the Government filed an opposed motion for a protective order regulating discovery. [ECF No. 18]. On April 5, 2024, Camargo filed a response to the Government's motion [ECF No. 19], and on April 12, 2024, the

Government filed a reply [ECF No. 20]. On April 15, 2024, the Court issued a protective order -- without the disputed paragraph. [ECF No. 21].

On April 23, 2024, Defendant filed a Motion to Dismiss the information. [ECF No. 22].

Thereafter, on April 24, 2024, a redacted version of the forensic interview video was produced.

**Defendant has a different take on the facts.**

As a general matter, he does not dispute the primary facts *themselves.* But he *interprets* them differently by emphasizing the gaps and by noting that the United States could have taken steps to move the case along but repeatedly failed to do so. And his timeline contends that the Government's explanations are illogical and display a lack of diligence.

At bottom, Camargo notes that the Government concedes that its investigation of the allegations in this case was **functionally completed by May 10, 2021,** the date of the last witness interview cited in its filing. After that point, its only explanation for the additional 17-month delay in presenting the information and subsequent 16-month delay in arresting Camargo is that it was "considering" its charging decisions and "checking in" with the alleged victim and potential witnesses.

According to the February 22, 2022 case update report, "the U.S. Attorney's [O]ffice, Southern District of Florida, ha[d] indicated to [Agent Luna] that this matter is

**not a priority**." (emphasis added). Therefore, Camargo argues, *that* is why the United States made no effort to speedily bring him to trial. This delay, he says, violated his constitutional rights.

Camargo emphasizes that the Government acknowledges that it made no attempt to arrest him for a full year after it filed an Information against him. It gives the same explanation for this post-information delay -- that it had to locate and "check in" with the alleged victim and witnesses. When the Special Agent did finally call Camargo a year after the charges were filed, he did *not* tell Camargo there was an arrest warrant or an information pending against him, but simply asked him "if they could meet to *discuss* the [case]." [ECF No. 31, p. 6 (emphasis added)].

The FBI then confirmed that Camargo lived at his registered address, but stated in a November 2023 report its agents would not arrest Camargo on a misdemeanor outside of "a controlled environment," and **recommended that he be informed** of the pending arrest warrant and given a **chance to self-surrender**.

But Camargo was not informed and was not given the choice to surrender. Instead, the Government waited more than two months to effectuate the arrest, and represented in its filing that was "[d]ue to operational logistics, including manpower and competing interests." *Id*. at 7.

To summarize, Camargo was questioned immediately on March 4, 2021. He cooperated with law enforcement, and provided his driver's license, phone number,

address, social security number, and date of birth to law enforcement. [ECF No. 22, pp. 1–2]. The Government was able to speak with him and locate him immediately using that information from March 2021 and his registered address as soon as law enforcement agents attempted to do so.

Camargo focuses on gaps in the Government's timeline. He was questioned on the same day as the incident (March 4, 2021), when he provided all his contact and identifying information to law enforcement. He was then released.

According to the Government, a federal investigation was opened shortly thereafter, and law enforcement completed interviews of the people they believed to be a potential victim or witness on March 19, April 15, 16, and 20, and May 10, 2021. [ECF No. 31, p. 3]. Then, "at the end of May 2021, the case agent provided some of the reports and evidence to the U.S. Attorney's Office" who "assessed [the case] to determine whether to bring federal charges." *Id*. at 4.

The Government's filing then jumps forward about seven months and says that SA Luna attempted to contact the alleged victim and her mother again "at the beginning of 2022." But SA Luna's February 22, 2022 case report sheds additional light on the *real* reason for this unexplained delay. It states: "(Agent's Note: the U.S. Attorney's Office, Southern District of Florida, has indicated to drafting Agent that this matter is not a priority and requested [REDACTED] be contacted to determine if her daughter was still willing to testify in this matter.)" (emphasis added).

According to the Government, the alleged victim's mother confirmed they wanted to move forward in April 2022. *Id*. at 5.

Then, there is another gap in the Government's timeline, with no explanation as to why the Information was not filed until October 2022 -- six months after receiving that confirmation and after the Government had already spent nearly a year making the decision to bring charges. The Government obtained an arrest warrant the same day the information was returned, on October 20, 2022 [ECF Nos. 3; 4], but made no effort to contact Camargo or arrest him, according to their filing, until October 13, 2023, nearly a year later. [ECF No. 31, pp. 5–6].

The only explanation the Government provides for this, *once again*, is that the Agent had to "check in" with the alleged victim "since they had not spoken in some months," and to "line[] up all the necessary witnesses" -- **the same reason given for the 19-month delay in bringing the charges.** *Id.*

But SA Luna's June 16, 2023 case report provides an even more damning explanation for the delay -- he writes, "As of this communication, this matter was pending and will remain so until such time the [U.S. Attorney's Office] moves forward with the prosecution of CAMARGO." (emphasis added). According to SA Luna, the case stalled because the Government was not moving forward with prosecuting it, even though the Information had been filed and the arrest warrant issued eight months prior.

A year after the Information was filed, the Government asserts that SA Luna finally moved forward with contacting Camargo. *Id*. at 6. He was able to do so by **using the phone number Camargo provided to law enforcement on the day of the incident, in March 2021.** The Government also acknowledges that law enforcement was able to confirm, in November 2023, that Camargo was living at the address on file with the Department of Motor Vehicles, driving a car registered in his name to that address. It then says that they waited more than two months to arrest him at that address because of "operational logistics, including manpower and competing interests," with no explanation of what that means. *Id*. at 7.

But, Camargo emphasizes, SA Luna's November 2023 report explains the real reason for the latest delay: "On 11/15/2023, [SA] Luna spoke with AUSA Lindsey Maultasch reference [sic] Camargo's lack of amenability to an interview. SA Luna informed AUSA Maultasch the FBI would not expend resources to arrest Camargo on a misdemeanor outside of a controlled environment (*e.g.*, FBI Miami field office, FBI Miami International Airport offsite), and recommended Camargo be informed of the arrest warrant and request he self-surrender."

But neither the FBI nor the federal prosecutors advised Camargo of the criminal charge, nor was he given the opportunity to self-surrender. Instead, he was arrested several months later.

Although the parties mentioned relevant dates as chronological milestones, a comprehensive, more-detailed timeline could be of help, and it is provided directly below:

- On March 4, 2021, Defendant assaulted the Minor Victim on a flight from Las Vegas, Nevada to Miami, Florida. [ECF No. 22, p. 1 (citing ECF No. 3)].

- On March 4, 2021, immediately after the flight, law enforcement questioned Defendant. [ECF No. 22, p. 1]. Defendant cooperated with law enforcement, including by providing his full name, date of birth, phone number, driver's license, social security number, and current address, where he was residing with his parents in Florida. [ECF No. 22, pp. 1–2].

- On March 16, 2021, investigating SA Luna authored a report about the alleged incident, including Defendant's address where he was living with his parents. *Id.* at 2.

- On March 19, 2021, the FBI separately interviewed two flight attendants. [ECF No. 31, p. 3].

- On April 15, 2021, the FBI interviewed the Minor Victim. *Id.*

- On April 16. 2021, the FBI interviewed a third flight attendant. *Id.*

- On April 20, 2021, the FBI interviewed a female passenger who attended the flight in question. *Id.* at 4.

- On May 10, 2021, the FBI interviewed a male passenger who attended the flight in question. *Id*.

- Through May 14, 2021, FBI documents report brief interviews and investigation. [ECF No. 22, p. 7].

- At the beginning of 2022, SA Luna checked in with the Minor Victim and her mother to assess whether to move forward with charges. [ECF No. 31, p. 5].

- February 9, 2022, SA Luna spoke with the Minor Victim and her mother per his February 22, 2022 report. The mother was supposed to reach out to SA Luna to let him know if they were willing to move forward with the charges.

- On February 22, 2022, SA Luna's case report states that "the U.S. Attorney's Office, Southern District of Florida, has indicated to the drafting Agent that this matter is not a priority[.]" [ECF No. 35, p. 3 (quoting SA Luna's February 22, 2022, case report)].

- SA Luna noted in this report that the mother hasn't reached out to him since the February 9, 2022 conversation.

- SA Luna also noted in this report that the U.S. Attorney's Office, Southern District of Florida "requested that [the mother] be contacted to determine if her daughter was still willing to testify in this matter." [ECF No. 42-2, p. 6].

- In April 2022, the Minor Victim and her mother indicated that they supported moving forward with charges. [ECF No. 31, p. 5].

- On May 26, 2022, Defendant moved to a new residence in Miami. [ECF No. 22, p. 7].

- Between July 2022 and November 2023, the state of Florida used Defendant's new address at least five times to mail receipts of his child support payments. *Id*.

- On August 25, 2022, Defendant updated his address on his driver's license. *Id*. at 2.

- On October 20, 2022, the United States Attorney's Office for the Southern District of Florida filed an Information charging Defendant with one count of assault within special aircraft jurisdiction, in violation of 18 U.S.C. § 113(a)(5). *Id.* (citing ECF No. 3).

- On October 20, 2022, the Information and arrest warrant were filed under seal. *Id.* (citing ECF No. 2).

- On October 23, 2022, federal agents searched DAVID for Defendant and the result showed his updated address. *Id.* at 7.

- On December 1, 2022, the case was transferred to fugitive status. *Id.* at 2 (citing ECF No. 5).

- In December 2022 and January 2023, SA Luna attempted to contact the Minor Victim's mother to confirm they were ready to proceed with the court proceedings but was unable to reach her. [ECF No. 31, pp. 5–6].

- SA Luna's June 16, 2023 report states that he made numerous phone calls and left unreturned voicemails and text messages.

- At the end of January 2023, an Accurint search provided two additional numbers for the Minor Victim's mother, but the numbers did not work. *Id.* at 6.

- In May 2023, SA Luna sent a letter to the Minor Victim's mother asking her to contact the FBI regarding the case, and the mother soon responded with her desire to proceed with the case. *Id.*

- In the mother's response to the letter, she provided SA Luna with her new telephone number per the June 16, 2023 report.

- In the summer of 2023, the AUSA handling the case was on paternity leave, and the case was reassigned to another AUSA.. *Id.* at 6.

- On June 16, 2023, SA Luna's case report states, "As of this communication, this matter was pending and will remain so until such time the [U.S. Attorney's Office] moves forward with the prosecution of [Defendant]." [ECF No. 35, p. 4 (quoting SA Luna's June 16, 2023, case report)].

- In the fall of 2023, law enforcement confirmed the availability and contact information for all necessary witnesses. [ECF No. 31, p. 6].

- On October 13, 2023, the Government began efforts to contact or arrest Defendant. [ECF No. 35, p. 3 (citing ECF No. 31, pp. 5–6)].

-      At the end of October 2023, SA Luna called Defendant and spoke to him. [ECF No. 31, p. 6]. Defendant informed SA Luna that he would be unavailable to discuss the incident in question for the next two weeks because he would be out of town. *Id.* SA Luna advised Defendant that he would follow up with him when Defendant returned to Miami. *Id.*

-      On November 13, 2023, SA Luna texted Defendant to organize a meeting but received no response. *Id.*

-      Around this time, the case was transferred from SA Luna to SA Fagan. *Id.*

-      On November 15, 2023, SA Luna's case report states that "the FBI would not expend resources to arrest [Defendant] on a misdemeanor outside of a controlled environment . . . and recommended [Defendant] be informed of the arrest warrant and request he self-surrender by a given deadline." [ECF No. 35, p. 4 (quoting SA Luna's November 28, 2023 case report)].

-       SA Luna's November 28, 2023 case report also noted SA Luna's October call with Defendant, SA Luna's November 13, 2023 text to Defendant, and Defendant's failure to respond to that text. [ECF No. 42-2, p. 11].

-      On November 30, 2023, law enforcement conduct surveillance conducted at Defendant's residence and observed one of Defendant's registered vehicles parked nearby. [ECF No. 31, pp. 6–7].

- On December 6, 2023, SA Fagan conducted a NCIC check for Defendant, revealing that Defendant had been arrested in July 2022. *Id.* at 7. SA Fagan requested and received the police report for that case. *Id*.

- On January 16, 2024, the warrant was entered into the NCIC system. *Id.*

- On January 17, 2024, agents surveilled Defendant's residence and observed his vehicle parked nearby. *Id.*

- On February 1, 2024, law enforcement went to Defendant's home and arrested him. [ECF No. 22, p. 2 (citing ECF No. 7)].

- On February 1, 2024, Defendant made his initial appearance, and the case was unsealed. *Id.* at 9 (citing ECF No. 6).

## II.    Applicable Legal Principles and Analysis

The Eleventh Circuit recently issued an opinion on the Sixth Amendment right to a speedy trial in *United States v. Vargas*, 97 F.4th 1277 (11th Cir. 2024). *Vargas* provides a comprehensive and detailed outline of the legal principles underlying this scenario.[4] The Undersigned will highlight the primary teachings of *Vargas* in the summary below, which quotes the legal rules utilized in our analysis :

---

[4]    *Vargas* was issued on April 3, 2024. Camargo's motion was filed approximately three weeks later, on April 23, 2024. The Government's response was filed on May 8, 2024, and Camargo's reply was filed on May 14, 2024. None of these three submissions mention *Vargas*, let alone discuss it, even though it is a 23-page opinion which serves as a *de facto* mini-treatise on speedy trial violations and how to interpret the critical factors.

1.      [A criminal defendant] can succeed on his claim that the [G]overnment violated his speedy trial right if he can establish that three considerations -- (1) the length of the delay, (2) the reason for the delay, and (3) the defendant's assertion of his speedy-trial right -- uniformly weigh heavily against the [G]overnment. *See Turner v. Estelle*, 515 F.2d 853, 856, 858 (5th Cir. 1975) (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972));[5] *see also United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003).

2.      Whether [a defendant's] right to a speedy trial was violated is a mixed question of law and fact. *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010). [The Eleventh Circuit] review[s] a district court's legal conclusions *de novo* and its factual findings for clear error. *Id.* [Our appellate court] will hold a factual finding clearly erroneous only if [it is] left with the definite and firm conviction that a mistake has been committed. *Id.*

3.      The [primary] basis for [this] claim is found in the Sixth Amendment to the U.S. Constitution, which provides that in all criminal prosecutions, the accused shall enjoy the right to a speedy trial. U.S. Const. amend. VI.

---

[5]      In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

4.      The Supreme Court has explained that the right to a speedy trial is "an important safeguard" that protects the interests of both the defendant and society. *United States v. Ewell*, 383 U.S. 116, 120, 86 S. Ct. 773, 15 L. Ed. 2d 627 (1966). From a defendant's perspective, the right to a speedy trial is designed "to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation[,] and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *Id.; see also Barker*, 407 U.S. at 532, 92 S. Ct. 2182. Moreover, while awaiting trial, a defendant may also be "subjected to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes." *Barker*, 407 U.S. at 532 n.33, 92 S. Ct. 2182 (citing *Klopfer*, 386 U.S. at 221–22, 87 S. Ct. 988).

5.      Society, too, has a strong interest in securing a speedy trial. A delayed trial causes backlog in the system; it increases the opportunity for the suspect to commit other crimes or try to escape while awaiting trial; and it impairs the goal of effective rehabilitation. *Id.* at 519–20, 92 S. Ct. 2182. Notably, the speedy-trial right is unique among the defendant's constitutional rights because it does not always serve the defendant's interests to assert the right; sometimes the defendant will be helped by a delay. *Id.* at 520–21, 92 S. Ct. 2182.

6.      In light of the multiple purposes underpinning the right to a speedy trial, the Supreme Court has explained that this right defies precise categorization and must

be determined by considering all of the circumstances. As [the Eleventh Circuit] has noted, these circumstances typically center around four factors: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Id*. at 530, 92 S. Ct. 2182.

7.      But despite articulating these factors -- now commonly known as the "*Barker* factors" -- the Supreme Court has cautioned that the right to a speedy trial is "a more-vague concept than other procedural rights," and that it is "impossible to determine with precision when the right has been denied." *Id*. at 521, 92 S. Ct. 2182. As a result, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Id*. at 522, 92 S. Ct. 2182 (citing *Beavers v. Haubert*, 198 U.S. 77, 87, 25 S. Ct. 573, 49 L. Ed. 950 (1905)); *see also Beavers*, 198 U.S. at 87, 25 S. Ct. 573 (speedy-trial right is "necessarily relative"). The inquiry will be an "ad hoc" one, balancing all relevant factors. *Barker*, 407 U.S. at 530, 92 S. Ct. 2182.

8.      The *Barker* factors were therefore originally intended to be only "some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right." *Id*. The Court has instructed that "none of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id*. at 533, 92 S. Ct. 2182. "[T]hese factors have no talismanic qualities" and "courts must still engage in a difficult and

26

sensitive balancing process," still recognizing that the right to a speedy trial is a fundamental one. *Id.*

9.     To this end, the Supreme Court has said that each of the *Barker* factors should be viewed on a sliding scale, with **few hard and fast rules**. "The first [factor] is actually a double enquiry." [*Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)] (emphasis added). At the outset, the accused must demonstrate a delay "approach[ing] one year" to "trigger a speedy trial analysis." *Id.* at 651, 652 n.1, 112 S. Ct. 2686; *see* [*United States v. Oliva*, 909 F.3d 1292, 1298 (11th Cir. 2018)]. Then, "the court must consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652, 112 S. Ct. 2686.

10.     The Supreme Court has **not dictated how much longer than one year the delay must last in order to weigh against the [G]overnment**. *See Barker*, 407 U.S. at 521, 92 S. Ct. 2182 ("We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate."). "[B]ecause of the imprecision of the right to speedy trial," the significance of the length of delay is "necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31, 92 S. Ct. 2182. In particular, "[t]he length of the delay . . . incrementally increase[es] in weight as the delay becomes increasingly protracted." *Villarreal*, 613 F.3d at 1350 (citing *Doggett*, 505 U.S. at 652, 655–57, 112 S. Ct. 2686) (emphasis added).

11.     As for the "[c]losely related" question found in the second prong -- that is, "the reason the [G]overnment assigns to justify the delay" -- the courts again have spoken in general terms. *Barker*, 407 U.S. at 531, 92 S. Ct. 2182. "Here, too, different weights should be assigned to different reasons." *Id.* The Court offered these thoughts:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [G]overnment. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the [G]overnment rather than the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Id.* (footnote omitted).

12.     In calculating this factor, [the Eleventh Circuit has] held the [G]overnment responsible for bearing the burden of establishing this factor, and, like the Supreme Court, we allocate different weights to different reasons for delay. *Villarreal*, 613 F.3d at 1351. [Our appellate court] has emphasized that the Sixth Amendment requires only a diligent, good-faith effort on behalf of the [G]overnment to locate and bring a defendant to trial. *United States v. Machado*, 886 F.3d 1070, 1080 (11th Cir. 2018); *see also Smith v. Hooey*, 393 U.S. 374, 383, 89 S. Ct. 575, 21 L. Ed. 2d 607 (1969). When the [G]overnment fails to pursue a defendant diligently, its negligence will weigh less heavily when it acted in good faith. *Villarreal*, 613 F.3d at 1351. The [G]overnment's negligence also weighs less heavily when "the defendant was at liberty and outside the jurisdiction

28

where the indictment was returned." *United States v. Bagga*, 782 F.2d 1541, 1544 (11th Cir. 1986).

13.     As for the third factor, the Supreme Court has noted that "[w]hether and how a defendant asserts his right is closely related to the other factors we have mentioned." *Barker*, 407 U.S. at 531, 92 S. Ct. 2182. So[ ] [the Eleventh Circuit has] found that a defendant's failure to timely assert his constitutional right to a speedy trial is weighed heavily against the defendant. *United States v. Twitty*, 107 F.3d 1482, 1490 (11th Cir. 1997). By the same token, a prompt assertion of the right weighs, sometimes heavily, against the [G]overnment. *See United States v. Ingram*, 446 F.3d 1332, 1338, 1340 (11th Cir. 2006).

14.     As for the last factor, [the Eleventh Circuit has held] that actual prejudice is not always a necessary showing for the defendant to establish the denial of his right to a speedy trial. *Hoskins v. Wainwright*, 485 F.2d 1186, 1188 n.3 (5th Cir. 1973). The former Fifth Circuit, in binding precedent, justified overlooking prejudice in these circumstances:

> At some juncture in a criminal prosecution the [G]overnment's lengthy, inexplicable delay, in the face of vigorous demands for an immediate trial, is so offensive to the Sixth Amendment's guarantee of a speedy trial that a Court must intervene regardless of whether the defendant has been incarcerated, subjected to public scorn and obloquy, or impaired in his ability to defend himself.

*Id.*

15.     The Court explained: "The reason for dispensing with the prejudice requirement entirely when the other three factors point heavily toward a violation of speedy trial is deterrence: the prosecution should not be permitted to engage in inexcusable misconduct on the hope that the defendant will not be able to make out a case of prejudice." *Turner*, 515 F.2d at 858 (footnote omitted); *accord United States v. Avalos*, 541 F.2d 1100, 1116 n.32 (5th Cir. 1976). Specifically,

> Where such misconduct has occurred, the state cannot complain that the legitimate interests of its criminal justice system, being pursued in good faith, are being sacrificed because of an honest mistake in a case in which no ultimate harm has been done.
>
> Mindful of the difficulties sometimes encountered in weighing prejudice, this Court has concluded that it will not undertake such an inquiry where the prosecutorial error to be forgiven by a finding of no prejudice is flagrant and inexcusable.

*Turner*, 515 F.2d at 858.

16.     So[] in discounting the prejudice requirement, [the Eleventh Circuit has] approached speedy-trial claims this way: No prejudice need be shown where the first three *Barker* factors "weigh *heavily* against the Government." *Ringstaff v. Howard*, 885 F.2d 1542, 1545 (11th Cir. 1989) (*en banc*) (emphasis added); *see also Doggett*, 505 U.S. at 651, 112 S. Ct. 2686. This is a high bar -- indeed, the term "heavily" is defined as "ponderously, massively; burdensomely, oppressively," *Heavily*, Oxford English Dictionary (rev. ed. Dec. 2023), https://www.oed.com/dictionary/heavily_adv (last visited Feb. 2, 2024) -- and [the Eleventh Circuit] intended just that. As [the Eleventh

30

Circuit has] stressed, "courts should not lightly dispense with the actual prejudice requirement because to do so necessarily results in the 'severe remedy of dismissal of the indictment.'" *Ringstaff*, 885 F.2d at 1544–45 (quoting *Barker*, 407 U.S. at 522, 92 S. Ct. 2182*); see also Barker*, 407 U.S. at 522, 92 S. Ct. 2182 (lamenting that dismissal "means that a defendant who may be guilty of a serious crime will go free, without having ever been tried").

17.     To drive home this point, [our appellate court has] consistently required that for a defendant to avoid making a showing of actual prejudice, *all three factors* must weigh heavily against the [G]overnment. (emphasis in original). *See Dunn*, 345 F.3d at 1296 (excusing the defendant from showing actual prejudice only if the first three *Barker* factors "uniformly weigh heavily against the [G]overnment" (emphasis added)); *United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985) (requiring the defendant to show actual prejudice "because only two of the first three *Barker* factors weighed heavily against the [G]overnment"); *Prince v. State of Ala.*, 507 F.2d 693, 707 (5th Cir. 1975) (excusing the defendant from showing actual prejudice only if "consideration of the other three factors -- length of delay, defendant's assertion of his right, and reasons for the delay -- coalesce in the defendant's favor" (citing *Hoskins,* 485 F.2d at 1192)).

18.     In short, "the three *Barker* factors must indeed weigh *heavily* against the Government before prejudice should be presumed." *Ringstaff*, 885 F.2d at 1545 (emphasis added by the *Vargas* Court). If they do not -- when, for example, "the delay

was not the result of bad faith or a deliberate attempt to 'hamper the defense,' and was a reasonable and efficient use of judicial resources" -- "a defendant is required to show he suffered actual prejudice in order to prevail." *Id.*

19.    The [first three *Barker*] factors are related and often must be considered together. *See Oliva*, 909 F.3d at 1301 (explaining that where "the first two factors, length of the delay and the reason for it, . . . overlap to an extent," we will "address them together"); *see also United States v. Stapleton*, 39 F.4th 1320, 1327 (11th Cir. 2022), *cert. denied*, ⸺ U.S. ⸺, 143 S. Ct. 2693, 216 L. Ed. 2d 1257 (2023) ("[T]he length of delay doesn't weigh heavily against the Government unless the *reason* for the delay also weighs against the Government.") (emphasis added by the *Vargas* Court); *Clark*, 83 F.3d at 1353.

Having listed the primary teachings of *Vargas*, we will now begin the analysis.

Our task is to apply this broad body of law to Camargo's claim that he was deprived of a speedy trial because the Government waited more than fifteen months to arrest him after it filed a one-count Information against him in October 2022. We will soon begin by asking whether the post-charge delay lasted longer than a year, which is the amount of time necessary to "trigger a speedy trial analysis." *Oliva*, 909 F.3d at 1298. Here, the delay lasted at least more than 15 months, which is enough time to trigger the *Barker* weighing test. Before analyzing the *Barker f*actors, though, we will initially discuss the applicability of the *pre*-charge delay.

In addition to objecting to the post-charge delay between the filing of the Information and his arrest, Camargo complains about the pre-charge delay (of more than 19 months) to bring the charge. The statute of limitations for the charge is five years. So the gap between the incident and the filing of charges is nowhere near the deadline established by the statute of limitations.

Pre-information delay (for purposes of a speedy trial analysis) should only be "accounted for if it is 'inordinate.'" *Oliva*, 909 F.3d at 1304 (citing *Ingram*, 446 F.3d at 1339). In *Oliva,* the Eleventh Circuit distinguished the two and a half years of pre-indictment delay in *Ingram*, from the two-year period in *Oliva*, because the investigation was more complex than that in *Ingram. Id.* at 1304–05.

Here, the United States argues that the 19-month pre-Information period cannot be considered "inordinate." First, it argues that the investigation did not end on the day of the incident. As noted above, in the months that followed the incident, law enforcement conducted additional investigation, which included a forensic interview of the Minor Victim, and subpoenaing records from American Airlines for the flight manifest. Additionally, this case involves a twelve-year-old minor victim who would be required to travel across the country to testify in court about a traumatic event if the case were to proceed to trial.

The Undersigned does not view this case as complex, and the tasks the Government mentions almost all took place at the very start of the investigation. Indeed,

as noted above, the interviews of all witnesses were completed in a matter of weeks. For purposes of analyzing the circumstances, but without actually ruling on whether the pre-charge delay is inordinate here, the Undersigned will *assume* (without substantively deciding) that the delay is inordinate and therefore will include the 19 months of pre-charge delay.

But adding the pre-charge delay would result in a total period of less than three years. The United States contends that a delay of this length should not weigh heavily against the Government. *See, e.g., Jackson v. Ray*, 390 F.3d 1254, 1263 (10th Cir. 2004) (concluding that an unexplained delay of more than four years did not excuse the defendant from having to prove actual prejudice); *United States v. Serna-Villarreal*, 352 F.3d 225, 232–33 (5th Cir. 2003) (concluding that a *three-year* and nine-month delay attributable to Government negligence was too short to weigh heavily against the Government).

And in our Eleventh Circuit's recent *Vargas* ruling, a delay of approximately *thirty-five months* (approximately the same timeframe at issue here, with the assumed pre-charge delay included) did not weigh heavily against the United States. *See also United States v. Stapleton*, 39 F.4th 1320, 1327–28 11th Cir. 2022), *cert. denied,* - U.S. – 143 S. Ct. 2693 (almost *four years*); *Machado*, 886 F.3d at 1077, 1081 (over *five years*); *Bagga*, 782 F.2d at 1543–44 (over *three years*); *Villarreal,* 613 F.3d at 1355 (*ten years*); *see also United States v. Register*, 182 F.3d 820, 827 (11th Cir. 1999) (requiring the defendant show prejudice where

there was a delay between arrest and trial of *thirty-eight months,* despite this being "an extraordinary period of time to force a defendant to wait for a trial"); *but see Ingram,* 446 F.3d at 1339–40 (an Eleventh Circuit panel held that the Government's two-year post-indictment delay, which was preceded by a two-and-a-half-year pre-indictment delay, excused a defendant from showing actual prejudice); *United States v. Dennard,* 722 F.2d 1510, 1513 (11th Cir. 1984) (affirming the district court's dismissal of an indictment as to one codefendant, without a showing of actual prejudice, where the post-indictment delay was fifteen months).

Our next assignment, then, is to determine whether a consideration of the first three *Barker* factors -- (1) the length of the delay, (2) the reason for the delay, and (3) the defendant's assertion of his speedy-trial right -- weighs heavily against the Government. The factors are related and often must be considered together. *See Vargas,* 97 F.4th at 1289 (citing *Oliva,* 909 F.3d at 1301 (explaining that where "the first two factors, length of the delay and the reason for it, . . . overlap to an extent," we will "address them together"); *Stapleton,* 39 F.4th at 1327 (11th Cir. 2022), ("[T]he length of delay doesn't weigh *heavily* against the Government unless the *reason* for the delay also weighs against the Government."); and *Clark,* 83 F.3d at 1353)).

As explained by the *Vargas* Court, the approach of considering the length of the delay with the reason for it is helpful -- and is particularly appropriate when "there were different forces at work for different parts of the delay." *Id*. at 1290.

The delay between the incident and the filing of the Information here can be conceptually divided into the following parts: (1) the initial investigation period, when the interviews were being finalized (March 4–May 14, 2021; (2) the period between the end of the interviews and when SA Luna "checked in" with the Minor Victim's mother (May 14, 2021 -- beginning of 2022); (3) the period when the U.S. Attorney's Office advised that the matter was not a priority and the filing of the Information (February 22, 2022 -- October 2022); and (4) the period when the COVID-19 pandemic hit and the practical end of the pandemic's impact on federal law enforcement operations ( March 13-2020 -- September 6, 2021).[6]

Our discussion of the pre-filing parts will begin with the Government's reference to the pandemic [ECF No. 31, p. 5]. The Government provides only a general nod to the pandemic, noting that it "was continuing to cause delays in court cases and air travel." But the Undersigned takes judicial notice of the myriad Administrative Orders entered

---

[6]     Administrative Order 2021-65, issued on July 8, 2021, ended with the following provision:

> Approximately 703 criminal cases are currently awaiting jury trials in this District. Given the limited availability of Court and juror resources, and continued exigent circumstances created by the pandemic, it remains generally unreasonable to expect all defendants to be tried imminently; an additional period of exclusion will promote the safe and orderly administration of justice. Again, the additional period of exclusion shall be for the period from July 19, 2021 until **September 6, 2021**.

S.D. Fla. Admin. Order 2021-65 (emphasis supplied).

36

by our District's Chief United States District Judge. Eleven administrative orders automatically continued all jury trials between March 16, 2020, and July 19, 2021. *See, e.g.,* S.D. Fla. Admin. Order 2020-18 (March 13, 2020); S.D. Fla. Admin. Order 2021-65 (July 8, 2021). Then, when jury trials returned in July 2021, they occurred in only a *limited* fashion. *See* S.D. Fla. Admin. Order 2021-65 (July 8, 2021).

The Orders also sought to stop the clock on all Speedy Trial Act calculations during this period. *Id.*; *see United States v. Dunn*, 83 F.4th 1305, 1316–18 (11th Cir. 2023) (holding that the pandemic-related continuances in a defendant's 2020 trial were within the ends-of-justice exception to the Speedy Trial Act and noting that many other Circuits had already held that COVID-19 justified "district-wide blanket order[s] temporarily continuing jury trials during this pandemic and excluding that time under the Speedy Trial Act's ends-of-justice exception."). In fact, as noted in *Vargas,* 97 F.4th at 1292, a district court explained, "as a practical matter, the COVID-19 pandemic made the process of empaneling juries (whether grand or petit) unfeasible and dangerous." *United States v. Dunn*, 2021 WL 4516138, at *5 n.3 (S.D. Fla. Oct. 1, 2021), *aff'd*, 83 F.4th 1305 (11th Cir. 2023); *see also United States v. Crittenden*, 2020 WL 5223303, at *3 (M.D. Ga. Sept. 1, 2020) ("The COVID-19 global pandemic places persons' health at substantial risk when they gather in groups in relatively close proximity to one another, particularly indoors where persons are talking[, like during a] jury trial.").

During some portion of the pre-charge delay, the "world . . . was not operating normally on account of the pandemic, and this was, surely, an understandable drag on the [G]overnment's inner workings." *Vargas*, 97 F.4th at 1292. The pandemic is "beyond the control of all the parties involved" and consequently "justifies an appropriate delay." *Id.* Although we cannot pinpoint a specific number of months of pre-charge delay in Camargo's case which is directly attributable to the pandemic, we can comfortably recognize that it was, at a minimum, a "complicating factor" which resulted in this period of time not weighing "heavily" against the Government. *Id.* (explaining that the pandemic did not give the Government "a complete pass to abandon all of its obligations and duties" but concluding that the court was "unable to hold the [G]overnment's negligence heavily against it").

Therefore, for purposes of evaluating the pre-Information delay, the Undersigned views the period of March 13, 2020 through September 6, 2021 to be a complicating factor. Therefore, we "cannot squarely blame the [G]overnment for all the delay occurring during this primary pandemic period. *Id.* at 1291. However, as noted, the Government did not file the Information until October 20, 2022 -- more than a year after the pandemic's primary impact had slowed considerably.

We consider the initial period (when interviews were being conducted) to be a scenario where the Government was acting diligently, and where the pre-charge delay was surely not inordinate. But that leaves several other gaps in the pre-charge timeline.

The first significant gap is from the May 2021 end of the interviews through February 2022, when SA Luna "checked in" with the Minor Victim's mother. Apparently, no law enforcement activity occurred during this period.

Although Camargo challenges this "check in" step as being unnecessary, the Undersigned does not share this perspective. Given the nature of the alleged offense and the age of the Minor Victim, it was perfectly reasonable to double-check and confirm that the Minor Victim was willing to go forward and testify at trial if charges were to be filed and Defendant were to demand a trial.

The Undersigned must confront the reality that a prosecutor advised, on February 22, 2022, that this case was not a priority. Nevertheless, the prosecutor also asked that the mother be contacted again to determine if her daughter was still willing to testify. SA Luna followed up on the prosecutor's request and spoke with the mother in April 2022, when she confirmed her daughter's support of the investigation. That moved the case forward slightly, but it did not significantly advance it.

Following this second check-in with the Minor Victim's mother, the Government did not take any significant steps until October 20, 2022, when it filed the Information. That is a six-month gap, and it occurred after the primary pandemic effects had taken place.

But these pre-charge gaps do not doom the Government's prosecution, nor do they necessarily support Camargo's view that dismissal is warranted. That is because our case

law authority[7] "illustrate[s] that even if little activity takes place for a year or two, the [G]overnment will not necessarily be held responsible for the delay, as long as the [G]overnment's conduct was unintentional and in good faith, **even if negligent**." *Vargas*, 97 F. 4th at 1293 (emphasis added).

A significant portion of the delay arose during the initial global slowdown triggered by the pandemic and some steps were taken then to move the case forward. But we cannot deny that a significant portion of the pre-charge delay caused Camargo's case to seemingly "fall through the cracks," and we also cannot say "that this negligence was so overwhelming as to make the [G]overnment at fault for the entire delay." *Id*. at 1294 (citing *Clark*, 83 F.3d at 1353).

Having discussed the pre-charge activity (and delays) and the reasons for the delays, we now shift focus to the *post*-Information activities and delays. Remember, pre-charge delays are considered only if they are inordinate, while post-charge delays are considered when the delay is more than a year, as is the situation here.

For all practical purposes, the Government could have arrested Camargo any time after the Information was filed. Agents learned of his updated address on October 23,

---

[7]     *See, e.g., Clark*, 83 F.3d at 1352–53, where the Eleventh Circuit "excused a seventeen-month delay between an indictment and the defendant's arrest even though few steps were taken to secure the arrest." *Vargas*, 97 F.4th at 1293. *See also Oliva*, 909 F.3d at 1302–03, 1305–06, where our appellate court "held that a twenty-three month delay between an indictment and the defendant's arrests did not weigh heavily against the [G]overnment." *Id.*

2022, when they searched a database. They simply failed to take the steps to effectuate an arrest.

On the other hand, SA Luna was unable to contact the Minor Victim's mother for a substantial amount of time -- because she moved and had not provided SA Luna with an updated telephone number. SA Luna was unable to speak with her from December 2022 through May 2023. Thus, the Government was confronted with a "missing witness" scenario, though it was not as problematic as some missing witness circumstances. SA Luna tried to reach her with two additional telephone numbers, which did not work. So he pursued *some* investigative steps to locate the Minor Victim's mother. But his efforts fell short. He ultimately sent a letter to the Minor Victim's mother in May 2023, asking her to respond. Presumably, the letter was forwarded to the Minor Victim's mother's new address, as she soon responded (and gave SA Luna her new telephone number and passed along her desire that her daughter proceed with the case).

In a way, we can credit SA Luna for having the investigative skill to use a letter to reach out to a missing witness. But the Government has not explained why SA Luna waited until May 2023 to send it. He could have sent it in December 2022 (or thereafter), when he was unable to connect with the Minor Victim's mother and she did not return voicemails and text messages. Therefore, on balance, SA Luna was somewhat negligent and his negligence helped prolong the delay associated with the need to arrest Camargo.

On the other hand, a "missing witness" is a "valid reason" to "justify an appropriate delay." *Id.* at 1292 (citing *Barker*, 407 U.S. at 531, 92 S. Ct. at 2182).

Moreover, even if we conclude that SA Luna was negligent in waiting to organize Camargo's arrest, that negligence does not cause the delay to be weighed "heavily" against the Government "when it was 'unintentional' and resulted from" an erroneous assumption causing confusion between two different federal law enforcement agencies. *Id.* at 1293 (citing *Clark,* where the Court excused a seventeen-month delay between an indictment and the defendant's arrest "even though few steps were taken to secure the arrest"). Significantly, the *Vargas* Court noted that the *Clark* scenario involved a defendant who had continuously resided in the same apartment listed on the arrest warrant, had attended classes at the same local university as he had before his alleged illegal activities and had not tried to elude the authorities.

In the instant case, it appears as though the new lead prosecutor (who had taken over the case from another prosecutor in the Summer of 2023) and SA Luna (and, later, SA Fagan, who took over in November 2023) were not on the same page concerning an arrest. On November 15, 2023, SA Luna's report announced that the FBI would not pursue Camargo's arrest on a misdemeanor outside of a controlled environment -- and recommended that Camargo be told of the warrant and be asked to self-surrender.

But there is no indication that the FBI's position was communicated directly to the new prosecutor. Regardless of whether anyone at the U.S. Attorney's Office was aware

of the FBI's position, the significant point is that the Government dropped the ball and did not advise Camargo of the charge or ask him to self-surrender (even though SA Luna spoke with him in late October 2023). No one can safely predict whether Camargo would have surrendered voluntarily had he been told of the chance, but the Government never gave him the opportunity because it never followed up on SA Luna's suggestion.

In addition, the United States has not explained why SA Luna (or his supervisors at the FBI) suddenly announced that they would not arrest him outside of a controlled environment. But even if there was justification for proceeding only with a controlled environment arrest, the Government has not comprehensively explained why it failed to do just that from May 2023, [when it finally located the missing witnesses (*i.e.*, the Minor Victim and her mother) and confirmed their willingness to testify] until the February 1, 2024 arrest.

Nevertheless, the Government has alluded to certain developments, such as the fact that the initial prosecutor was on paternity leave in the Summer of 2023 (and the case was reassigned), and the November 2023 transfer of the case from SA Luna to SA Fagan. Thus, these delays are the type of "falling-through-the-cracks" scenarios which do not generate "overwhelming" negligence sufficient to place "the [G]overnment at fault for the entire delay." *Id.* at 1294.

The Undersigned views the delay from May 2023 (when the Minor Victim's mother finally responded to the Government's efforts to reach her) through January 16,

2024 to be largely the result of inattentiveness and a failure to timely and accurately communicate (between the FBI and the U.S. Attorney's Office). The Undersigned selects January 16, 2024 because that is when the warrant found through an NCIC check -- revealing Camargo's arrest in another matter -- was entered into the NCIC system. After that, SA Fagan moved the case forward. He arranged for surveillance to begin at Camargo's residence on January 17, 2024.

The inescapable reality is that the Government was able to speak with Camargo and locate him immediately using that information from March 2021 and his registered address as soon as agents attempted to do so.

Nevertheless, as highlighted by the *Vargas* Court, "at no point during the thirty-five-month period did the [G]overnment intentionally delay [Camargo's] arrest to further prosecutorial strategy, to cause any harm to his defense or personal life, or for any other purposeful reason." *Id*. Similar to the Court's analysis in *Vargas*, "in no way do we see how the delay could have helped the [G]overnment's case against [Camargo]." *Id*.

Moreover, similar to the scenario in *Vargas,* it is "also telling" that Camargo was "living freely" during the months from the incident to his arrest. As the *Vargas* Court noted, about its own jurisprudence in language applicable here, "[t]hough a purposeful attempt to delay the trial to prejudice the defendant or to gain a tactical advantage for itself should weigh heavily against the Government, a more neutral reason, **such as negligence**, does not necessarily tip the scale in favor of the defendant, *particularly where*

44

*the defendant was at liberty and outside the jurisdiction where the indictment was returned.*" *Id* (quoting *Bagga*, 782 F.2d at 1544 (italics emphasis added by the *Vargas* Court; bold emphasis supplied; citation omitted).

The *Vargas* Court provided a summary of the impact of a defendant's ability to live his life freely in language which rings true here as well:

> All of this is to say that because the [G]overnment was, at most, **negligent** for a portion of the delay, during which time [the defendant] was **free to come and go** without any impediment, we agree with the district court's conclusion that the delay taken as a whole **should not be weighed "heavily" against the [G]overnment**.

*Id.* (emphasis supplied).

Having discussed and analyzed the length of and reasons for the delay, we turn to the third *Barker* factor -- whether Camargo timely asserted his constitutional right to a speedy trial. *See id.* at 1295 (citing *Clark*, 83 F.3d at 1353).

Camargo asserted his speedy trial right through this dismissal motion. He filed it even before he received all discovery, in order to avoid any argument that he is any way responsible for a delay.

Most significantly, the United States expressly conceded that Camargo asserted his speedy trial right. [ECF No. 31, p. 15]. However, the Government argues that this is not dispositive of the speedy trial analysis because he did not file the motion to dismiss until April 23, 2024, nearly three months after his arrest. Therefore, the Government argues, that this third *Barker* factor does not weigh *heavily* against it (because it says the

key facts were known from the beginning, Camargo could have filed the motion immediately after arrest, and he filed a motion to continue the trial date).

The Undersigned is not persuaded by the Government's rhetoric. Camargo acted timely. To the extent he waited to file the motion, he was waiting to receive discovery and his counsel was involved in a legal dispute with the prosecutor over the language of a protective order -- a dispute which Judge Gayles resolved in favor of Camargo. Moreover, many of the significant points raised by Camargo were not known to him immediately upon arrest, such as a prosecutor's comment that the case did not have priority and that the Government never acted on the suggestion that he be told of the charge and be asked to surrender.

Therefore, the Undersigned views this third factor as one weighing heavily against the United States.

But that is only *one* of three factors. The other two *Barker* factors do not weigh heavily in his favor, which means he must demonstrate actual prejudice. Camargo says that he did show this, but the Undersigned is not convinced.

A defendant can demonstrate actual prejudice in light of three interests: the need to (1) prevent oppressive pretrial incarceration; (2) minimize the defendant's anxiety and concern; and (3) limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532. The most serious interest is the last. *Id*. Further, "conclusory assertions of prejudice, including unsubstantiated allegations of witnesses' faded memories, are insufficient to

46

constitute proof of actual prejudice." *United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1994) (internal citations omitted); *see also United States v. Valiente*, No. 04-20046-CR, 2009 WL 1313198, at *21 (S.D. Fla. May 12, 2009) ("[The] [d]efendant's claim that she is no longer able to obtain potentially helpful documents—such as old emails, phone records, wire transfers and referral fees—were supported by nothing more than the statements of counsel and do not constitute evidence sufficient to carry her burden of proof."); *Bibb*, 194 F. App'x at 623 (the defendant did not specify "what evidence was lost or what witnesses he could not locate" but instead, made "general allegations that the delay prejudiced his defense").

Here, Camargo's motion simply proclaims that the delay "disadvantage[d] the defense's ability to investigate and mount a defense." [ECF No. 22, p. 12]. In his reply, Camargo argues that,

> there could well have been witnesses that would be helpful to the defense because they were seated within view of the alleged incident and recall seeing nothing. Or the witnesses interviewed who recall seeing very little or hearing statements might have additional information that law enforcement didn't ask about or memorialize, that they would not recall now.

[ECF No. 35, p. 10].

But these comments are hypothetical observations which could be made in *any* criminal case. They are speculative and vague. Moreover, as noted by the *Vargas* Court, 97 F. 4th at 1296, Camargo may have personally *benefitted* from the Government's delay. As a result of the Government's delay, Camargo was neither arrested or detained during

the first two years of the COVID-19 pandemic (through March 2022), when the pandemic "pose[d] novel health risks to incarcerated inmates" and impaired inmates' abilities to prepare for their own defenses.

Had the United States been more focused and organized (and less negligent), it may well have been able to file an Information against Camargo and arrest him by mid-May 2021, after the initial interviews were completed. But that would have been only slightly more than a year after the pandemic impacted the world, including law enforcement investigations in our country. As succinctly noted by the *Vargas* Court, "we find it hard to take seriously Vargas' suggestion that he would have preferred to have been arrested, processed and detained during this unforgiving time period." *Id.* at 1297.

Now that we have discussed the Sixth Amendment issues, we shift to Camargo's argument that Fed. R. Crim. P. 48(b)(3) requires dismissal. We are not persuaded.

Rule 48 allows a court to dismiss an information "if unnecessary delay occurs in . . . bringing a defendant to trial." Fed. R. Crim. P. 48(b)(3). "The rule thus vests much discretion in the trial court, and dismissal is mandatory only if the defendant's **constitutional** rights have been violated." *United States v. Butler*, 792 F.2d 1528, 1533 (11th Cir. 1986) (emphasis added).

Here, in light of the extensive Sixth Amendment analysis and the fact that Defendant's constitutional rights have not been violated, it is apparent there was no unnecessary delay warranting relief pursuant to Rule 48(b). *United States v. Knight*, 562

48

F.3d 1314, 1324 (11th Cir. 2009) ("When a defendant fails to establish that his Sixth Amendment right to a speedy trial was violated, 'there is no basis for concluding that the district court abused its discretion in refusing to grant appellant's motion insofar as it relied on [Rule 48(b)].'" (quoting *Butler*, 792 F.2d at 1533)). Consequently, any delay that exists in this case does not warrant the extreme remedy of dismissal of the information under Rule 48(b).

## III.    Conclusion

The Undersigned **respectfully recommends** that Judge Gayles **deny** Camargo's motion to dismiss. The Government's conduct here, while surely negligent at times and for certain gaps, does not reach the level of being "most reprehensible." *Vargas*, 97 F. 4th at 1297. Likewise, this is not a case involving delays caused by Government delay which was "deliberate, intentional or otherwise in bad faith." *Id.* at 1295. Given that Camargo has not established that all of the first three *Barker* factors weigh heavily against the Government (as he established only *one* of the three factors), he must establish prejudice, which he has not done here.

## IV.    Objections

The parties shall have **four (4) days** to file written objections, if any, with Judge Gayles and an additional **four (4) days** to file a response to the other party's objection.[8]

---

[8]     The objection and response deadlines have been shortened because of the upcoming trial date and because the issues have been amply briefed.

Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on May 31, 2024.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
The Honorable Darrin P. Gayles
All Counsel of Record